IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Tammy Rene Millmine as Personal Representative of the Estate of Billy Frank Cornett, Jr., and in her individual capacity, | ) ) ) ) | C/A NO. 3:10-1595-CMC |
| | ) | **OPINION and ORDER** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Major James Harris, Lt. Kevin Jones, Sgt. Sheralet Taylor, C/O Mary McElveen, C/O Farish Anderson, John Doe Lexington Correctional Officers 1-5, individually and in their official capacities, | ) ) ) ) ) ) | |
| Defendants.[1] | ) ) | |
| _____ | ) | |

On June 24, 2007, Billy Ray Cornett, Jr. (Cornett), son of Plaintiff Tammy Rene Millmine,

committed suicide by hanging in a shower stall while he was a pretrial detainee in the Lexington

County Detention Center. Plaintiff, in her capacity as Cornett's Personal Representative, brought

suit in this court, alleging constitutional violations under 42 U.S.C. § 1983, as well as several state

law claims.

This matter is before the court on Defendants' motion for summary judgment. Plaintiff has

responded in opposition, and Defendants have replied. On February 21, 2012, this court held oral

argument regarding Defendants' motion, and the parties thereafter supplemented the record. For the

reasons set forth below, the court **grants in part and denies in part** Defendants' motion for

---

[1]Defendant Cassandra Means was previously dismissed from this action with prejudice by agreement of the parties. Defendant Prison Health Services was dismissed from this action without prejudice by Order filed January 31, 2011. ECF No. 34.

summary judgment. This matter shall proceed to trial on the question of whether Defendants McElveen and Anderson were deliberately indifferent to the serious medical needs of Cornett.[2]

## I. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

---

[2]The complaint also asserts claims for deliberate indifference to a substantial risk of serious harm. *See* Compl. at 6 (ECF No. 1). However, Defendants' summary judgment motion and Plaintiff's response speak only in terms of deliberate indifference to Cornett's serious medical needs. Fourth Circuit cases dealing with jail suicides speak in terms of jailers being deliberately indifferent to the serious medical needs of the decedent. *See, e.g.*, *Short v. Smoot*, 436 F.3d 422 (4th Cir. 2006); *Cortez v. Prince George's County, Md.*, 31 F. App'x 123 (4th Cir. 2002); *Brown v. Harris*, 240 F.3d 383 (4th Cir. 2001); *Ward v. Holmes*, 28 F.3d 1212 (4th Cir. 1994) (Table); *Smith v. Winston*, 4 F.3d 986 (4th Cir. 1993) (Table); *Hill v. Nicodemus*, 979 F.2d 987 (4th Cir. 1992); *Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992); *Buffington v. Baltimore County, Md.*, 913 F.2d 113 (4th Cir. 1990) (en banc); *Belcher v. Oliver*, 898 F.2d 32 (4th Cir. 1990). The court believes that a claimed constitutional violation in a jail suicide case is more aptly described as alleged deliberate indifference to a substantial risk of serious harm in the form of self-harm. However, the standard for evaluation of deliberate indifference under either is the same. *See Parrish v. Cleveland*, 372 F.3d 294, 302 n.10 (4th Cir. 2004) (noting that the standard of liability for deliberate indifference to a substantial risk of physical harm and deliberate indifference to serious medical need "is the same, and therefore independent analysis of each count is unnecessary.")

Rule 56(c)(1) provides as follows:

(1)    A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

(b)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine [dispute] through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## B. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

At the time of his suicide on June 24, 2007, Cornett was a pretrial detainee in the custody of the Lexington County Detention Center (LCDC). Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 243 44 (1983); *Young v. City of Mount Ranier*, 238 F.3d 567 (4th Cir. 2001). Therefore, even though Plaintiff's complaint speaks in terms of violation of the Eighth Amendment, the applicable constitutional provision is the Fourteenth Amendment. The standard for evaluation of Plaintiff's claims, however, is the same. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (concluding that because it is sufficient for liability under the Eighth Amendment, "deliberately indifferent conduct must also be

3

enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial"); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (applying deliberate indifference standard to pretrial detainee's claim that he was denied needed medical treatment); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.").

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to serious medical needs of prisoners. *See* 429 U.S. at 104 05. However, the court did not define the term "deliberate indifference."

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court defined "deliberate indifference" and set forth the framework for analysis of claims of deliberate indifference. First, to violate the Constitution, an alleged deprivation must be "objectively, sufficiently serious." *Id*. at 834. "A substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by the first prong of *Farmer*." *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (citing *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (applying the deliberate indifference standard to the conduct of government officials when a prisoner suffers from a "serious psychological condition[ ]" such as being suicidal));[3] *Buffington v. Baltimore County, Md.*, 913 F.2d 113, 120 (4th Cir. 1990) (en banc) (same).

Second, an official must have "a sufficiently culpable state of mind. " *Farmer*, 511 U.S. at 834 (internal quotations omitted). The requisite state of mind is "deliberate indifference." *See id*.

---

[3]As recognized in *Clinton v. County of York*, 893 F. Supp. 581, 584, (D.S.C. 1995), the standard in *Gordon* (objective reasonableness) "must be revised somewhat in light of" *Farmer*, which applied a subjective standard.

In *Farmer*, the Supreme Court expressly equated the "deliberate indifference" standard with the "subjective recklessness" standard of criminal law. *See id*. at 839-40; *see also Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (same). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).

To be deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk [to inmate health or safety] exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[I]t is enough [to establish liability] that the official acted or failed to act despite his knowledge of a substantial risk [to inmate health or safety]." *Id*. at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk [to inmate health or safety] from the very fact that the risk was obvious." *Id*.

However, "that a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so." *Id*. at 844. Additionally, an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Id*. That is, "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" for a constitutional violation. *Id*.

A prison official is also not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is

insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quotation and citation omitted).

## II. PARTIES AND/OR CLAIMS TO BE DISMISSED

Plaintiff names Defendants "John Doe Lexington County Correctional Officers 1-5." A plaintiff may name "John Doe" as a defendant when the identity of a defendant is unknown. However, a district court is not required "to wait indefinitely" for a plaintiff to provide a defendant's true identity to the court. *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980). Plaintiff has had sufficient time to identify all the defendants in this action yet has failed to identify any John Doe defendants. Therefore, Defendants "John Doe Lexington County Correctional Officers 1-5" are dismissed from this action without prejudice.

Additionally, Plaintiff names Defendant Major James Harris. There is no evidence that Harris was ever served with a summons and complaint, nor has he made any appearance in this matter. Therefore, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, Harris is dismissed from this action without prejudice.

Plaintiff offers no argument to counter Defendants' position that Defendants Lt. Kevin Jones and Sgt. Sheralet Taylor should be dismissed from this action with prejudice as they were not present at the time of Cornett's suicide.[4] It is well-settled that in order for an individual to be liable under § 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of rights. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Additionally, to state a § 1983 claim, Plaintiff must show that Cornett suffered a specific injury as a result of specific conduct of

---

[4]Defendant Jones was not on duty; Defendant Taylor was the Sergeant on duty, but was patrolling another wing of the floor at the time of Cornett's suicide.

6

a defendant, and an affirmative link between the injury and that conduct. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, (1976). Further, vicarious liability theories such as respondeat superior are not available in § 1983 actions. *Vinnedge*, 550 F.3d at 928. Therefore, Defendants Lt. Kevin Jones and Sgt. Sheralet Taylor are entitled to summary judgment and they are dismissed from this action with prejudice.

The remaining Defendants, Anderson and McElveen, are employees of the Lexington County Sheriff, who is an "arm of the state." *See Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996); *Gulledge v. Smart*, 691 F. Supp. 947, 954 (D.S.C. 1988), *aff'd*, 878 F.2d 379 (4th Cir. 1989); *Cone v. Nettles*, 417 S.E.2d 523, 524-25 (S.C. 1992). Therefore, to the extent sued in their "official capacity," Defendants Anderson and McElveen are immune from suit because they are treated as "arms of the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). These official capacity claims are therefore dismissed without prejudice.[5]

Plaintiff concedes that her claim for failure to train should be dismissed, as "each officer testified that [he or she] received training on suicide prevention and awareness." Pl's Resp. to Dfts' Summ. J. Mot. at 8 (ECF No. 58). Therefore, as Plaintiff concedes there is no basis for this claim, it is dismissed with prejudice.

In Plaintiff's response to Defendants' summary judgment motion, Plaintiff "concedes" that her state law claims for wrongful death and survival should be dismissed from this action, but seeks their "remand" to the Lexington County Court of Common Pleas. *Id.* As "remand" of these claims

---

[5]Plaintiff seeks "remand" of these claims to the Court of Common Pleas for Lexington County. However, this matter was filed as an original action in this Court. Therefore, "remand" is inappropriate.

is not possible (see footnote 5), the court dismisses Plaintiff's state law claims for wrongful death and survival against Defendants Anderson and McElveen without prejudice.[6]

### III. FACTS

Considered in the light most favorable to Plaintiff, the facts are as follows. On October 9, 2006, Billy Frank Cornett, Jr. (hereinafter "Cornett"), was arrested and booked into the Lexington County Detention Center (LCDC) on three misdemeanor charges.[7]

Prior to his incarceration in 2006, Cornett had a long history of mental illness and at least two commitments to psychiatric facilities. Plaintiff, Tammy Rene Millmine, testified that as early as age eleven or twelve, Cornett would "talk[ ] about suicidal stuff" and would "threaten" suicide. Depo. of Tammy Rene Millmine at 18, 19 (ECF No. 54-2). Cassandra Means (Means) was a Lexington

---

[6]Because this case is to proceed to trial, final judgment is not entered until all of Plaintiff's claims are determined. Fed. R. Civ. P. 54(b). Plaintiff filed suit in this matter on June 21, 2010, three (3) days prior to the expiration of the statute of limitations period. Pursuant to 28 U.S.C. § 1367(d), "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." The constitutionality of this statute was upheld in *Jinks v. Richland County*, 538 U.S. 456 (2003).

[7]Cornett had been incarcerated in LCDC on two prior occasions, once in 2003 and again in 2004. During both his 2003 and 2004 detentions at LCDC, Cornett was seen regularly by mental health professionals for incidents of self-destructive behavior. For example, in early October 2003, Cornett was seen by a mental health professional with the notation: "[Inmate] has a red marking on neck which appears to be from some type of possible attempt at strangulation. [ ] Other [inmate] on floor states [Cornett] is suicidal." Inmate Mental Health Status, dated October 3, 2003 (ECF No. 76-1 at 21). The assessor recommended placing Cornett on "Maximum Precautions," which is noted as "close observation, no blankets, risk reduction clothing." *Id*. On other occasions, Cornett told mental health professionals that "previous suicide attempts are because he is angry. He denies that he 'wants to die.'" Mental Health Follow-Up Contact Sheet, dated November 13, 2003 (ECF No. 75-2 at 65).

On November 3, 2004, Cornett was discovered in his cell "with what appeared to be two pieces of cloth tied in knots around his neck. The color in his face was blue and purple in color." Incident Report of Ronald Palmer, dated November 3, 2004, time 20:55 (ECF No. 75-1 at 54).

County Community Mental Health employee who was a triage counselor and case manager at LCDC and saw Cornett on a regular basis beginning in 2006. Means testified in her deposition that Cornett had been diagnosed with bipolar disorder, borderline personality disorder, and had borderline intellectual functioning. Depo. of Cassandra Means at 17-18 (ECF No. 80-7).

The record establishes that at the time of Cornett's death, officials at LCDC had precautions in place which were intended to protect suicidal inmates from self-harm. Upon initial booking into LCDC, a standard assessment was performed by the booking officer which included questions about past suicide attempts and other questions relating to mental health. *See*, *e.g.*, Lexington Co. Sheriff's Dept. Booking Form, dated April 26, 2007 (ECF No. 78-2 at 17-19). If an inmate was deemed a suicide risk during booking, the inmate was placed in an observation cell in the booking area until he or she could be assessed by a mental health professional. Depo. of Kevin Jones (hereinafter "Jones Depo.") at 11 (ECF No. 80-6). After such an assessment, an inmate could be cleared for placement in the jail's general population, remain in the booking area, or housed in the jail's "Special Management Unit" (SMU).[8]

If jail authorities believed an inmate was a danger to himself, the inmate could be placed on "max watch" or "constant observation." To be placed on "constant observation" meant officers or mental health personnel believed the inmate to be an imminent threat to himself or herself, and the inmate would be housed in the jail's booking area where officers would keep the inmate under constant observation. Jones Depo. at 24.

---

[8]LCDC's SMU housed individuals with specific mental health issues, as well as individuals who were in protective custody and inmates who were "medical inmates in confinement." Depo. of Sheralet Taylor at 12 (ECF No. 80-9).

If a suicidal individual was on "max watch," the inmate was housed in SMU and observed every fifteen (15) minutes by an LCDC officer.[9]  *See* Prison Health Services Policy/Procedure J-G-05 at 4 (noting the difference between "constant observation" and "close observation"), *Millmine I*, ECF No. 57-4 at 4 (filed Aug. 1, 2010).  Officers recorded their 15-minute observations on an "Observation Record Max Watch Q15" log (hereinafter "Max Watch logs").[10]

Inmates threatening self-harm could also have their regular "jail" clothing removed and be dressed in a "suicide" or "max watch" gown.  *See* Jones Depo. at 17.  This gown was made of a material which was almost impossible to tear.[11]  *See* Depo. of Sheralet Taylor (hereinafter "Taylor Depo.") at 14 (ECF No. 80-9) (agreeing with question that "you can't tear [ ] or rip" a suicide gown); Depo. of Mary McElveen (hereinafter "McElveen Depo.") at 10 (ECF No. 80-8) (agreeing that suicide blanket and gown are made of material that "couldn't rip.").  An inmate's access to bedding

---

[9]Defendant Taylor testified in her deposition that the decision to place an inmate on "suicide" or "max" watch was made by either "one of the senior staff members such as a sergeant or above or medical or mental health" personnel.  Depo. of Sheralet Taylor at 15 (ECF No. 80-9).

[10]At the hearing held February 21, the parties agreed to the use of and reference to documents filed in  a previous suit brought by Plaintiff, *Millmine v. Lexington County, South Carolina, et al.*, D.S.C. Civil Action No. 3:09-1644-CMC ("*Millmine I*").  Prison Health Services (PHS) was the contract medical provider at LCDC at the time of Cornett's suicide.  These Max Watch logs were filled out on forms provided by PHS.  For purposes of this case, the court assumes that "max" watch and "close" watch are interchangeable terms.

[11]An option of clothing an inmate in a "paper gown" may also have existed at least during Cornett's earlier incarcerations.  *See, e.g.*, Incident Report of Rodney Rankin dated November 4, 2004, time 20:21 (ECF No. 75-1 at 56) (nothing that Cornett was "depressed and had thoughts of harming himself," and Rankin observed "redness on the neck of [Cornett] and asked him how it happened. [Cornett] replied it was just from the rubbing of the max watch gown.  Due to prior attempts to harm himself, [Cornett] . . . was placed in a paper gown." *Id.*

and other items could also be restricted,[12] including provision of a "suicide" or "max watch" blanket made of the same material as the "gown." McElveen Depo. at 10.

Suicidal inmates had regular and/or emergency access to mental health professionals, including a physician who made contact with the inmates and prescribed medications. *See*, *e.g.*, Progress Notes, dated February 9, 2007, April 26, 2007, and May 3, 2007 (ECF No. 78-1 at 39-40). If medical personnel and/or LCDC officers believed an individual was an imminent threat to himself, the inmate could also be placed in restraints or, as a final measure, placed in a "restraint chair" for a period of time. *See*, *.e.g.*, Max Watch Logs dated December 2, 3, & 4, 2006 (ECF No. 76-2 at 30-33) (full restraints); Incident Report of Jackie Granger, dated December 2, 2006, time 22:08 (ECF No. 75-1 at 52) (noting that Cornett "was placed in the restraint chair for his safety and as a precaution to prevent this inmate from trying to harm himself."); Mental Health Status, dated December 3, 2006 (ECF No. 76-1 at 25) ("Coordinated with correctional staff to have inmate placed in safety chair due to level of risk [of self-harm].").

Officials at LCDC communicated information between shift personnel in briefings and in "pass-down books." The purpose of these "pass-down books" or "logs" was to give the officers "information [about what] happened while we weren't there to let us know what to look forward to." Taylor Depo. at 7 (ECF No. 80-9). *See also* McElveen Depo. at 11 (testifying that these logs are "announced prior to shift briefing . . . and the supervisor . . . will go over that information pertaining to what occurred prior to our days off or our shift off."). Even though the "pass-down books" or

---

[12]For example, on December 29, 2006, the mental health professional who assessed Cornett recommended that he remain on "Maximum Precautions (close observation, no blankets, risk reduction clothing)" but that he be "give[n] mattress back." Mental Health Status, dated December 29, 2006 (ECF No. 76-1 at 46).

"logs" were maintained by shift sergeants, the information was provided to officers such as Defendants Anderson and McElveen. Taylor Depo. at 16.[13]

After his arrest in October 2006, Cornett was placed on "max watch" several times due to his self-destructive behavior. The evidence currently in the record establishes that Cornett was on "max watch" from October 31, 2006, through November 7 or 8, 2006; from December 2, 2006, through January 3, 2007; and again from January 28, 2007, through February 11, 2007.[14] Records also indicate that Cornett was on "max watch" from May 29, 2007, to the date of his death on June 24, 2007. *See* ECF No. 76-2 at 3-58, 77-1 at 1-52 & 77-2 at 1-8. On some of these days, he was not only on "max watch," but also "Max Watch Full Restraints." *See, e.g.*, Max Watch logs dated December 2, 3 & 4, 2006 (ECF No. 76-2 at 30-33).

Cornett engaged in a variety of self-destructive behaviors in the months leading up to his suicide. For example, on October 31, 2006, Cornett was found in his cell with a sheet tied around his neck. He was placed on "constant watch" at booking, and a suicide prevention gown was substituted for his regular jail clothing. Mental Health Follow-up Contact Sheet, dated October 31, 2006 (ECF No. 75-2 at 53). Thereafter, on November 8, 2006, the mental health professional who interviewed Cornett found that he did not need to remain on "max watch" and that he was "OK for gen[eral] pop[ulation]." Mental Health Follow-up Contact Sheet, dated November 8, 2006 (ECF No. 75-2 at 51-52).

---

[13]Defendants Anderson and McElveen were on duty in Cornett's housing area at the time of his suicide, and are the only remaining Defendants in this matter.

[14]Cornett was involuntarily committed to Bryan Psychiatric Hospital from February 12, 2007, through March 19, 2007. This is discussed *infra*.

On December 2, 2006, Cornett was discovered in his cell "covered up with part of a sheet tied around his neck." Incident Report of Jackie Granger, dated December 2, 2006, time 22:08 (ECF No. 75-1 at 53). Cornett told Sergeant Granger that

> he was going to kill himself one way or another[.] He made the comment that when he got out of jail that he would go out on the interstate and jump off a bridge. He said that he would clim[b] up on the sink and jump off head first on the floor. I then had the inmate placed in full restraints. He then said that would not stop him from doing what he intended to do. . . . In about two minutes CO Stirewalt[ ] saw him clim[b] up on the sink . . . . Inmate was placed in the restraint chair for his safety and as a precaution to prevent this inmate from trying to harm himself.

*Id.* The mental health professional who saw Cornett on December 3 noted that Cornett "relate[d] numerous prior suicide attempts including jumping, hanging, run[ning] into traffic." ECF No. 76-1 at 7. Defendant was placed on "max watch."

Even while on "max watch," Cornett repeatedly engaged in self-destructive behavior. On December 3 at 10:00 a.m., Officer Michael Griggs was called to Cornett's cell by mental health personnel who indicated that Cornett "needed to go into the restraint chair because [he] was contemplating running his head into the cell wall or jumping off his cell sink in order to hurt himself." Incident Report of Michael Griggs, dated December 3, 2006, time 10:00 (ECF No. 58-4 at 6). Griggs indicated that "during morning shift change [that day][15] I found a whole wash rag in [Cornett's] cell and when mental health nurse Benasotti was talking to [Cornett], I noticed red marks on his neck and pieces of string on his max watch gown as if he had tried to tie the string around his neck again." *Id.*

---

[15]Officers at LCDC appear to work twelve-hour shifts: 6:00 a.m. to 6:00 p.m., and 6:00 p.m. to 6:00 a.m.

On December 5, 2006, Means saw Cornett after he was "found by CO's [with] sheet around his neck again. Placed on max watch[.] Due to wanting to see [mental health] smeared feces all over walls." Mental Health Follow-Up Contact Sheet, dated December 5, 2006 (ECF No. 76-1 at 27).

On December 27, 2006, Cornett was found with a "hard" plastic jelly packet, attempting to slit his wrist. Incident Report of Eliza Davis, dated December 27, 2006, time 05:00 (ECF No. 75-1 at 55). Cornett resisted attempts to take the packet from him and after the ensuing struggle, stated, "I'll just find another way to kill myself." *Id*. Cornett was placed in the restraint chair for his safety and "began to bang his head on the door very hard. His helmet was adjusted and he was moved away from the door." *Id*. Cornett remained in "max watch" status until January 3, 2007.

On January 28, 2007, Cornett was discovered on the floor of his cell with "toilet paper rolled up in a noose" around his neck. Incident Report of Michael Griggs, dated January 28, 2007, time 14:30 (ECF No. 72-4 at 3). "Cornett's face and neck [were] turning purple or a blue color." Incident Report of Kevin Richmond, dated January 28, 2007, time 16:30 (ECF No. 72-4 at 4). The toilet paper was removed, and Cornett was checked by a nurse. Thereafter, "while doing security checks [that day] . . . he would continually talk about how he was trying to figure out a way to kill himself." *Id*. "At approximately 1725 hours while doing a security check [an officer] observed [Cornett] standing on top of sink getting ready to jump." *Id*. Cornett was placed in a restraint chair for his safety. *Id*. At approximately 9:45 p.m. that evening, Cornett was removed from the restraint chair by Defendant McElveen and Officer Richard. Incident Report of Mary McElveen, dated January 28, 2007, time 21:45 (ECF No. 72-4 at 5). Medical notes from January 28, 2007 indicate Cornett was

14

"placed on suicide watch [because] attempting to place and tie toilet paper to neck    unable to succeed [with] tying."   Progress Notes, dated January 28, 2007, time 16:00 (ECF No. 78-1 at 49).

On January 29, 2007, a "Sick Call Request" was received by LCDC medical personnel, signed by Cornett on January 27, 2007.  Cornett asked to be seen by medical personnel, stating, "I have a sour [sic] thoat [sic] . . . upset stomach chest pain stomach cramps."  ECF No. 75-2 at 42. At the bottom of this Request Form is noted: "Unable to assess I/M due to I/M eating a cup of BM. Refer back to MH [Mental Health]."  *Id*.

On January 30, 2007, an Incident Report was filed by Correctional Officer Fred Hopkins. Hopkins noted that "during mental health interviews . . . [it was] found that . . . Cornett . . . [was] not stable enough to be moved to general population. [The mental health professional] stated that [he] must be kept on mental health status until further notice [and] that Inmate Cornett, Billy was to remain on max watch per Major Harris' orders."  Incident Report of Fred Hopkins, dated January 30, 2007, time 10:00 (ECF No. 72-4 at 7).

Means met with and assessed Cornett on January 30, 2007.  Means indicated that Cornett "reports he was being threatened by others in the pod. . . . [Cornett] denies that he is truly suicidal." Mental Health Follow-up Contact Sheet, dated January 30, 2007 (ECF No. 76-1 at 42).

On January 30, 2007, the Max Watch logs from 1820 hours to 2205 hours are marked "6." According to the logs' "Care and Observation Codes," a "6" denotes "threatening self-destruction." The officer making these observation notes was Defendant Anderson.  *See* ECF No. 77-1 at 19.

15

On February 1, 2007, Cornett and his roommate[16] flooded their cell "due to the fact they weren't allowed to have matts [sic] and they were held on maxwatch until Major Harris said otherwise." Incident Report of Jason Creech, dated February 1, 2007, time 14:55 (ECF No. 72-4 at 9).

On February 2, 2007, notes from an interview by mental health personnel show that Cornett was seen as a follow-up to prior meetings and in relation to "flooding cell yesterday and [patient] comments yesterday re: being suicidal [and] killing self by refusing to eat. [Patient] denied role in flooding room . . . . [Patient] report[s] depression was situational [ ] re: length of stay here [and] not being able to get in contact w/ his lawyer." Progress Notes, ECF No. 78-1 at 42.

On February 6, 2007, Cornett was found in his cell "with something white around his wrist . . . . Cornett's arm was turning purple or a blue color." Incident Report of Officer FNU Collins, dated February 6, 2007, time 20:00 (ECF No. 72-4 at 11). Cornett was removed from his cell and placed in the restraint chair. *Id*.

On February 7, 2007, Cornett was seen by mental health personnel at 11:41 "as a result of sick call slip turned in 1/27/07 . . . where inmate couldn't be evaluated [because of] ingestion of BM however, cc of CP, nausea, sore throat, stomach cramps . . . . At first, admitted to eating feces but later on was 'not sure' if he had ingested feces or not . . . . Does not wish to go to Bryan [Psychiatric Hospital]." ECF No. 78-1 at 49.

Later on February 7, 2007, Cornett reported to Officer Hopkins during a security check that "he felt like busting his head open." Incident Report of Fred Hopkins, dated February 7, 2007, time

_____

[16]For some period of time while housed in the SMU, Cornett had a roommate. On the day of his death, however, he was housed in a cell by himself.

17:30 (ECF No. 72-4 at 12). Officer Hopkins reported the situation to "Sgt. McDermott," who spoke to Cornett. "Cornett answered that he was told to inform us if he was feeling like suicide." *Id.* Cornett was placed in the restraint chair without incident.

On February 7, 2007, the Max Watch logs between 1820 and 2105 are marked "6," "threatening self-destruction." ECF No. 77-1 at 13. These observations were made and noted by Defendant Anderson.

On February 8, 2007, medical notes indicate that at 21:00 hours, medical personnel were "unable to do sick call R/t I/M eating a cup of BM. Referred to MH." ECF No. 78-1 at 49.

On February 8, 2007, the Max Watch logs between 21:20 and 22:50 are marked "6," "threatening self-destruction." ECF No. 77-1 at 10. These observations were made and noted by Defendant Anderson.

On February 9, 2007, Correctional Officer Creech found Cornett "hitting his head on his cell door." Incident Report of Jason Creech, dated February 9, 2007, time 16:45 (ECF No. 72-4 at 13). Cornett was removed from his cell and placed in the restraint chair for his safety.

On February 9, 2007, a "follow up [psychatric] MD note" indicates that "[Patient] seen, [illegible] dep [and] SI; another incident w/ officers [yesterday]. Will do [involuntary commitment] papers" for commitment to Bryan psychiatric facility. ECF No. 78-1 at 43.

On February 9, 2007, a sheet titled "Medical Observation Sheet Segregation/Isolation" notes that at 20:00 hours, Cornett was "standing [at] door. Alert. Verbal 'when am I leaving?'" ECF No. 78-1 at 19.

On February 11, 2007, Officer Edward Heard found Cornett in his cell "banging on the door with his head. I opened his door and asked him what was wrong. He told me that this was his last

night here and that he was going out with bang. . . .   It was determined to place Inmate Cornett in the restraint chair for his safety."   Incident Report of Edward Heard, dated February 11, 2007, time 22:00 (ECF No. 72-4 at 14).  Cornett was placed in the restraint chair by Heard and Defendant McElveen. *Id*.

On February 12, 2007, Means filled out an application of Involuntary Emergency Hospitalization for Mental Illness.[17]  Merrie Anna Cherry, the physician who examined Cornett for emergency admission, made the following notation in support of the application:  "P[atient] is permanently on Max Watch [at LCDC] in padded gown due to his inconsistent behaviors [and] breaking contracts with [mental health] and officers re: self harm.  He has had multiple suicide attempts [and] gestures since at LCDC (hanging x2, 'drowning' self in toilet, banging head against the wall) and [patient] reports currently suicidal . . . ."  ECF No. 75-2 at 67.

Cornett was thereafter transferred to Bryan Psychiatric Hospital ("BPS") on February 12, 2007, where he remained until March 19, 2007.  For an unknown reason, Cornett was not returned to LCDC, but was released by BPS officials to "outpatient status."  ECF No. 78-1 at 39 (medical notes from interview on April 26, 2007, noting that Cornett had been "release[d] inappropriately to OP [outpatient] status from" Bryan Psychiatric Hospital).

On March 20, 2007, State of South Carolina Circuit Judge William P. Keesley issued an order for bench warrant for Cornett's arrest, as the charges which had led to his incarceration in October 2006 were still pending.  ECF No. 80-4 at 105.

---

[17]A previous application was begun by Sharon Harvin on February 9, 2007.  *See* ECF No. 75-2 at 25-26 & 75-2 at 21 & 24.  However, for an unknown reason, this application was not completed by Dr. Cherry.

On April 24, 2007, Cornett incurred new charges and was arrested and taken to LCDC that same day. On Cornett's booking sheet from that date, he is listed as a suicide risk, and that he had attempted to kill himself at some time during the six months prior to his incarceration on April 24. ECF No. 78-2 at 25, 27.

At the time of booking on April 24, 2007, jail officials housed Cornett in an observation cell under "constant observation" in the jail's booking area for mental health observation.

Two days later, on April 26, 2007, Cornett was seen by Means for a mental health evaluation. On April 26, Cornett denied suicidal ideation, and Means recommended that he be released into the general jail population. It appears Cornett was subsequently released into the jail's general population.

Means met with Cornett on May 18, 2007 "at [Cornett's] request." Aff. of Cassandra Means at 6 (ECF No. 53-3). They discussed issues regarding medications and she "recommended that Mr. Cornett's status [in general population] be maintained." *Id*.

On May 29, 2007, at approximately 8:50 p.m., Correctional Officer Jeff Derrick observed Cornett "standing on the desk top with a spork sharpened in his right hand pushing it into his neck." Incident Report of Jeff Derrick, dated May 29, 2007, time 20:51 (ECF No. 72-3 at 3). Derrick and three other officers attempted to persuade Cornett to give up the sharpened spork, but he stated "he would take his life and anyone else who wanted some." Incident Report of Kevin O'Dell, dated May 29, 2007, time 20:05 (ECF No. 72-3 at 1). Officers entered the cell, subdued Cornett, and removed the weapon. Cornett was checked by medical personnel, given a "max watch" gown, and placed in a constant observation cell at the booking area.

On June 1, 2007, Means met with Cornett. At that time, Cornett was in protective custody on "max" watch. Means asked Cornett why he was in "max" watch, and she noted that Cornett "reports that he had asked the CO's to moved him due to 'problems with my roommates.'" Mental Health Follow-Up Contact Sheet, dated June 1, 2007 (ECF No. 76-1 at 43) . Means noted that Cornett "presents as though he was a victim, a script he often reverts to when not getting his wants met. [Cornett] has a [history] of making false allegations toward others . . . ." She recommended that "his status be maintained." *Id.*

On June 7, 2007, a Memorandum was written and distributed by "Sgt. Pfannenstiel" to "All Shift Personnel" that Cornett

> will be on Protective Custody and Maximum Security Watch [and] until further notice, the following steps will be taken: He will be receiving all his meals in a paper bag with no eating utensils. Cellophane and other food wrappings are to be removed as his meal is being inspected. He will not have access to a mattress. He will have a Maximum Security Blanket and Maximum Security Gown. Ensure that his fingernails are kept short. All actions taken, i.e. inspections, having nails clipped, etc. need to be documented.

ECF No. 58-10 (filed Nov. 7, 2011). There is no evidence in the record regarding what prompted this Memorandum.

On June 17, 2007, Cornett was seen by a mental health counselor who "assessed [Cornett] at request of medical staff and Sgt. Claussen[,]" and that Cornett "[c]laimed he 'fell' earlier after experiencing 'pain' in the torso area. . . . Denies any suicide gesture/attempt prior to reported 'pain.'" Mental Health Follow-up Contact Sheet, dated June 17, 2007 at 8 (ECF No. 53-3). This mental health professional noted Cornett was "[n]ot in any apparent psychiatric distress at this time. Oriented and cooperative." *Id.*

On June 20, 2007, notes from Cornett's medical chart indicate the following: "Call from 1st Floor at about 21:00 that Billy had put toilet paper around his neck and passed out. Went to 1st floor paper had been taken off Cornett. He was in bed breathing, check him, he was OK He had a 1" red mark around his neck; talking and breathing OK. Placed on psych." Progress Notes dated June 20, 2007, time 21:00 (ECF No. 78-1 at 36).

On June 21, Cornett was again seen by Means. The Follow-Up Contact Sheet states:

> Per report from Major Harris & Vickie Watkins (assistant), [Cornett] attempted to kill himself by wrapping 1 ply toilet tissue around his neck. Ms. Watkins reported that per the report that he was 'shaking' and that [Cornett] stated he was 'tired of being in jail.' Major Harris reported he was informed that [Cornett] 'turned blue.' [Cornett] has [history] of gestures and of Axis II [diagnosis]. Risk is present due to possibility of accidentally killing self via attention seeking behaviors.

ECF No. 53-3 at 9. Means indicated that at the time of her assessment, Cornett denied suicidal ideation. *Id*.

On June 23, 2007, the day prior to Cornett's suicide, Defendant McElveen found Cornett smearing feces on the walls of his cell, with toilet water and urine on the floor of his cell. *See* Incident Report of Mary McElveen, dated June 23, 2007, time 23:02 (ECF No. 58-4 at 3). McElveen indicated that Cornett "laid underneath his bunk refusing to communicate verbally. Inmate Cornett was given a shower. He was also provided with a clean max watch gown and blanket. After the completion of cleaning his room, Inmate Cornett returned to his assigned cell." *Id*. The incident report states that "I Of McElveen and Of Anderson were assigned to first floor." *Id*. The Max Watch logs for the evening of June 23 establish that Defendant Anderson was the officer charged with monitoring Cornett that evening. ECF No. 77-1 at 38.

Both Anderson and McElveen testified in their respective depositions that on the evening of June 24, 2007, they arrived on shift at approximately 6:00 p.m. Depo. of Farish L. Anderson (hereinafter "Anderson Depo") at 8 (ECF No. 80-5); McElveen Depo. at 11 (ECF No. 80-8). There is no specific testimony in the record what their duties were that evening except that they worked together as a "two-man post," McElveen Depo. at 20; that they were responsible for "head count," at the beginning of the shift, Anderson Depo. at 8; that they were responsible for "rotating" four rooms of SMU inmates on A-Wing for recreation time, *id*.; and were "responsible for the complete recreation of C wing, which are confines." *Id*.

Officer Anderson's notations in the Max Watch logs between 18:15 and 20:30 hours indicate that Cornett was "walking/standing quietly." Max Watch Log dated June 24, 2007, filed in *Millmine I*, ECF No. 57-6 (filed Aug. 1, 2010).

At approximately 9:00 p.m. on June 24, 2007, Anderson released Cornett from his cell for "recreation time."[18] Anderson testified in his deposition that he (Anderson) "briefed him, let him out, checked his room, brought him to the recreation area." Anderson Depo. at 8.

While in the recreation area, Cornett "was walking around, talking like he always did. Attempted to make telephone calls. I don't know if there was something wrong with the phone, but

---

[18]Cornett was released into an indoor area which contained, among other items, a table, a television, a telephone and a shower stall. At the hearing held February 21, 2012, Defendants supplied a diagram of the area in question, but it does not include a scale of dimension. *See* Dfts' Ech. 6 from Hearing held February 21, 2012 (ECF No. 72-1). Anderson testified in his deposition that there are only a few steps from the "tower" where he and McElveen were stationed to the "transport" room where "[we can talk back and forth to the inmate, pass [into the recreation area] anything we need while we're in the tower." Anderson Depo. at 12.

he kept trying to make telephone calls." Anderson Depo at 8-9.[19]  Cornett then began a conversation with Anderson, and McElveen departed to conduct a security check in the "B-Wing" area.  Between 9:20 and 9:30 p.m., Cornett asked Anderson that he (Cornett) be allowed to take a shower.  *See* Anderson Depo. at 9 10; McElveen Incident Report dated June 24, 2007, time 22:00 (ECF No. 58-4 at 2).  Upon this request, Anderson radioed McElveen (who was still conducting a security check in "B-Wing" area) to bring Cornett a towel, washcloth, and "toilet packet."  Anderson Depo. at 11; McElveen Depo. at 18-19.  McElveen complied with Anderson's request, "opened the door that separates the recreational Siders], and gave [Cornett] the towel and washcloth."  McElveen Depo. at 19.[20]

McElveen and Anderson then both returned to "the tower," an observation room overlooking the recreation area in question.  McElveen's June 24 Incident Report indicates Cornett "did not enter the shower as he continued to pace the floor."  ECF No. 58-4 at 2.   McElveen testified that she and Anderson were "[sitting in the tower area [sic] was separating him from us.  It was just a glass window so we can see him the entirety [sic]."  McElveen Depo. at 18.  The record is unclear exactly how far the shower stall is from the "tower."[21]  However, the shower stall is apparently close enough

---

[19]There was also a television set in the recreation area, and Anderson testified in his deposition that Cornett "was not much for television." Anderson Depo. at 10.  However, Anderson told Special Agent Wilkes that on the night of his suicide, Cornett was on television restriction because of a "recent incident in which he smeared feces all over himself and his cell." ECF No. 75-1 at 6.

[20]McElveen may not have handed the towel directly to Cornett, as Anderson testified that "[T]he placed a toilet pack, washcloth, and a towel on the table, alerted him that it it was there." Anderson Depo. at 11.  *See also id*. (Cornett "secured the towel, washcloth, and the packet *off the table*.") (emphasis added).

[21]Anderson testified in his deposition that "from the tower there's an open we would call it a 'transport room.'  We can talk back and forth to the inmate, pass him anything we need to while

23

to the "tower" for Cornett and Anderson to have a conversation while Cornett was in the shower. Additionally, Anderson's incident report indicates that once Cornett turned on the water, he (Anderson) could hear the water running from his position in the "tower." Incident Report of Farish Anderson, dated June 24, 2007, time 22:00 (ECF No. 75-1 at 12).

At approximately 9:40 p.m., Anderson reminded Cornett that his recreation time was ending, and that if Cornett wished to shower, he should proceed. Anderson testified Cornett "reached over toward the phone again to attempt a telephone call. And he said, 'Mr. Anderson, I guess I'll take a shower.'" Anderson Depo. at 11. Anderson testified that Cornett placed the towel and washcloth on a hook outside the shower stall and began taking his shower at approximately 9:45 p.m. Both McElveen and Anderson testified that Cornett conversed with Anderson as he stepped into the shower and for some time period thereafter. However, Anderson does not recall how long they spoke. See Anderson Depo. at 12-13. Both officers remained in "the tower" while Cornett was in the shower. There is no evidence in the record what the officers were doing while in the tower.

Both officers testified that once the shower curtain was drawn, it was not possible to see directly into the shower. A diagram and photographs of the area, however, show that the shower area is *around a corner* from the "tower" window referenced by McElveen, and therefore it was not possible for officers to see an individual from the tower *at all* once he or she stepped into the shower dressing area. *See* Dfts' Ech. 1, 2, & 6 (ECF No. 72 at 1-2 (photographs) & 72-1 (diagram)).

At "two or three minutes" before 10:00 p.m., Anderson and McElveen exited "the tower, secured it, [and] McElveen [went] to lock down the other recreation . . . inmates. So I opened the middle door, and I called his name. He didn't respond. I secured the middle door, and I went and

we're in the tower." Anderson Depo. at 12. See note 18, *supra*.

pulled the shower curtain back. And I saw him there hanging." Anderson Depo. 13. Cornett had fashioned a noose from of strips of fabric torn from the edge of the towel which he then fastened to the shower head, which protruded from the wall. *Id*. at 13  14.

Anderson radioed for assistance but did not immediately cut Cornett down from the showerhead because he "wanted to wait for some assistance because I wanted to ensure his body wasn't put in a more harming state." *Id*. at 15. Anderson believed Cornett was  unconscious when he found him. *Id*. Officers Joseph Stirewalt and Officer Richard responded at approximately 21:58. Incident Report of Joseph Stirewalt, dated June 24, 2007, time 21:58 (ECF No. 75-1 at 18). Once these officers arrived, Anderson cut Cornett from the showerhead, and Stirewalt cut the strips of towel from around Cornett's neck. Cornett was placed on the floor, and Stirewalt "checked inmate Cornett's pulse on his left wrist and felt a faint pulse." *Id*.

Officers did not immediately begin cardiopulmonary resuscitation (CPR). At 22:01 hours, Nurse Burnett Gaston arrived, and at 22:05, Nurse Brent Mills arrived and began CPR. Efforts to revive Cornett continued by Gaston and Mills until the arrival of EMS personnel. Cornett was transported from LCDC by EMS personnel and was later pronounced dead at a local hospital.

McElveen testified that at the time of his death, Cornett was the only inmate in SMU on suicide, or "max," watch. McElveen Depo. at 21. Additionally, Cornett was in the recreation area alone at the time of his suicide. *See* SLED Investigative Report at 2 (ECF No. 75-1 at 6).

Prior to this incident, both McElveen and Anderson had received training in suicide prevention as a part of their law enforcement training and continuing education. However, McElveen testified that she had not been involved with other cases where someone attempted to

commit or had committed suicide. McElveen Depo. at 11. Anderson also testified that he never seen an inmate attempt suicide. Anderson Depo. at 20.

McElveen testified in her deposition that while Cornett would "have his moments at time where he would smear [ ] feces[,]" McElveen Depo. at 12, he "was always nice to me," and treated her "with respect." *Id.* McElveen also testified that Cornett was a mental health patient "but he didn't act out on my watch to me to see a mental health state." *Id.* at 14. However, when McElveen was interviewed by South Carolina Law Enforcement Division (SLED) Special Agent E.D. Wilkes, Jr., McElveen reported that Cornett was "'obsessed with death' and had a long history of mental problems." ECF No. 74-3 at 1.

Anderson testified that he had not witnessed any of Cornett's prior attempts at suicide. Anderson Depo. at 7. Anderson also testified that he "never had no problem with" Cornett. *Id.* at 12. However, Anderson told Special Agent Wilkes that Cornett was in protective custody because of "past bizarre behavior and suicide attempts." SLED Report, ECF No. 75-1 at 6.

McElveen testified that on the evening of the suicide, she had spoken with Cornett and that he was acting "normal." McElveen Depo. at 12. Anderson testified that he had a several-minute conversation with Cornett prior to his suicide and that Cornett was acting "rational." Anderson Depo. at 12.

At the time of Cornett's suicide, LCDC did not have a specific policy which prohibited personnel from giving "max watch" inmates a towel and permitting them to shower unattended behind a curtain. Jones Depo. at 17-18. *See also id.* at 18 ("[We never had an inmate hang [himself] in the shower" while in the protective custody unit.). McElveen testified that at the time of Cornett's death, officers were to "check on" suicidal inmates while they were showering, for example by "just

calling the name in the process of walking through the [recreation] area [where the shower was located]." McElveen Depo. at 24. Neither Anderson nor McElveen checked on Cornett while he was showering, other than when Anderson spoke with him when he first entered the shower. In addition, on June 7, Sergeant Pfannenstiel had issued a specific written Memorandum which had prohibited Cornett's access to regular clothing and bedding, as well as other items which he could conceivably use in a self-destructive manner, such as cellophane and eating utensils. Nevertheless, Cornett was provided a towel by McElveen at Anderson's request before Cornett entered the shower area.

## IV. DISCUSSION

Defendants argue Plaintiff has failed to demonstrate that they acted with deliberate indifference to Cornett's serious medical needs, that is, a serious risk of physical harm to himself by suicide. Plaintiff maintains that both Anderson and McElveen exhibited deliberate indifference when they provided him a towel and left him unattended to shower, which was "tantamount to giving [Cornett] a pistol, a bullet, and fifteen minutes of complete privacy." Pl's Memo. in Opp. at 6.

"[T]he search for blame or fault, particularly with the benefit of hindsight, can too easily infect what must be a dispassionate analysis . . . . The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." *Rollgergert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 797 (8th Cir. 1991). Moreover, "[i]t is deceivingly inviting to take the suicide, *ipso facto*, as conclusive proof of deliberate indifference." *Id*. at 796. However, "[i]n determining the substantiality of the risk that [Defendants] knew, and the reasonableness of [their] response to it, [the court] must consider everything that [they were] told and observed." *Brown*, 240 F.3d at 390. These objective facts inform an evaluation of Defendants' knowledge of the risk of

Cornett's suicide, and whether they actually drew the inference that their actions uniquely increased the risk of his suicide.

Both McElveen and Anderson knew Cornett was classified as a suicide risk and had been placed on "max watch" by jail authorities for repeated incidents of self-destructive behavior. Additionally, while both Defendants testified in their depositions that Cornett never gave them any problems, the record establishes that both Defendants were personally involved in incidents where Cornett was either "threatening self-harm" (as evidenced by Anderson's Max Watch log notes on January 30, 2007 and February 7, 2007) or his placement in the restraint chair for his own safety (as evidenced by Officer Heard's Incident Report of February 11, 2007, noting that he and McElveen placed Cornett in the restraint chair because Cornett said that he was "going out with a bang."). Moreover, McElveen told Special Agent Wilkes that Cornett was "obsessed with death," and Anderson reported to Wilkes that Cornett had engaged in "past bizarre behavior and suicide attempts." Additionally, the inference can be drawn that both Anderson and McElveen were aware of Cornett's commitment to the Bryan Psychiatric Hospital. Anderson was directly involved in monitoring Cornett and recording information in the Max Watch logs on several days immediately preceding Cornett's involuntary commitment; McElveen assisted in placing Cornett in the restraint chair the evening before his departure because of his threat to "go out with a bang."

Just two and a half weeks before his suicide, Cornett's access to bedding, eating utensils, cellophane, and "regular" clothing was restricted by a specific written Memorandum dated June 7, 2007, a copy of which was disseminated to "All Shift Personnel," with copies to "First Floor" personnel. ECF No. 58-10 at 1. Defendants do not argue that they were unaware of this Memorandum, and based upon its being addressed to "All Shift Personnel," the inference can be

28

drawn that both Anderson and McElveen were aware of its contents.  *See Iko v. Shreve*, 535 F.3d

225, 242 (4th Cir. 2008) (finding defendants had actual knowledge of risk of harm to an inmate

based upon, *inter alia*, a written institutional directive requiring decontamination of inmates after

use of pepper spray).  Given their specific knowledge that he was on "max watch" for prior suicide

attempts, the court finds that McElveen and Anderson knew, as a general matter, that Cornett was

a suicide risk.

The law provides, however, that to be found deliberately indifferent, a defendant must have

drawn the inference of the role his or her actions played in increasing the risk of harm.  *See id*.

(noting that in case of inaction of a defendant, defendant "must have actually known their response

was inadequate.").  In other words, Plaintiff must establish that Defendants "were plainly placed on

notice of a danger and chose to ignore the danger notwithstanding the notice."  *White v. Chambliss*,

112 F.3d 731, 737 (4th Cir. 1997).  *See also Parrish*, 372 F.3d at 305 (defendants must "appreciate[

] the incremental risk that they themselves created" by their actions).  To this end, McElveen testified

in her deposition that as part of her training, she was aware that suicidal inmates are not given

"regular" sheets because of a known risk that inmates can rip sheets and use them as ligatures to

hang themselves.  McElveen Depo. at 10.  McElveen also testified to the following:

> Question: Would it be fair to say it was the    consistent with your training and policy
> at the Lexington County Detention Center that a person like Mr. Cornett on suicide
> watch in his cell, he would not be able to have regular bed sheets, is that correct?
>
> Answer:  Yes, sir.
>
> Q:  And/or pillowcases?
>
> A:  We do not have pillowcases.
>
> Q:  He wouldn't be allowed to have a towel?

A: No, sir.

Q: And is the reason for that is because those things can be ripped and made into ligatures or nooses to hang oneself?

A: That is correct.

McElveen Depo. at 23-24. No questions regarding bedding or towels were posed to Anderson in his deposition. However, Anderson testified that he had participated in suicide prevention training as a part of his job. Therefore, the inference can be drawn that at some point, Anderson had been exposed to the same type of information regarding the potential danger to suicidal inmates posed by bedding and/or towels.

An official is not deliberately indifferent if he or she has a reasonable response to the problem of which he or she is aware. Jail authorities took a variety of reasonable precautions to protect Cornett from himself. This included clothing him in a suicide gown after at least June 7, 2007, restricting his access to bedding material, and ensuring that he did not have access to any implements of self-destruction.[22] These acts decreased the risk that he would be able to attempt suicide. The court is aware that "the feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry." Parrish, *supra*, 372 F.3d at 310. However, in this case, it is not that Defendants Anderson and McElveen failed to take additional precautionary measures. Rather, these

---

[22]The June 7 directive provided that Cornett would

be on Protective Custody and Maximum Security Watch [and] until further notice, the following steps will be taken: He will be receiving all his meals in a paper bag with no eating utensils. Cellophane and other food wrappings are to be removed as his meal is being inspected. He will not have access to a mattress. He will have a Maximum Security Blanket and Maximum Security Gown.

ECF No. 58-10.

Defendants provided an inmate on max watch in a suicide gown[23] due to self-destructive behavior a towel and opportunity to shower in a location where he could not be observed from the tower. Other than speaking with Cornett at the start of the shower, neither Defendant left the tower to check on Cornett or to observe that the towel was not hanging outside the shower. This evidence, in the light most favorable to Plaintiff, "supports the inference that [Defendants] recklessly disregarded the risk that [Cornett] would commit suicide." *Coleman v. Parker*, 349 F.3d 534, 539 (8th Cir. 2003). *See also id.* (finding that factual issues remained for a jury to decide whether officers recklessly disregarded detainee's suicide risk of which they knew when "they issued Coleman a bed sheet and placed him in a cell where they could not easily observe him."). *See also Buffington*, *supra*, 913 F.2d 113 (affirming jury award against officer who had reason to know detainee suicidal and yet placed inmate in isolated cell with no observation and without removing clothing); *Brown v. Harris*, 240 F.3d 383, 391 (4th Cir. 2001) (finding defendant not deliberately indifferent because she responded reasonably by "eliminating his access to the instrumentality that he used to attempt suicide previously."). *See also Odom v. South Carolina Dep't of Corr.*, 349 F.3d 765 (4th Cir. 2003) (finding that record established defendant "was both aware of an excessive risk to Odom and simply disregarded it.").

Both Defendants testified that Cornett was acting "normal" and was "rational." Moreover, there is evidence that Cornett engaged in a variety of behaviors which officers and others believed were not true attempts at suicide. For example, Captain Kevin Jones testified that "Billy liked

---

[23] "[T]he whole reason for th[is] garment" is "to prevent [the individual] from hanging [himself]." Depo. of Ron McAndrew at 89 (ECF No. 74-2 at 23). McAndrew is Plaintiff's expert, and was employed in corrections for twenty-three years. He testified that he has been qualified to testify as an expert witness in twenty to twenty-five cases across the country. *Id.* at 9.

attention. He was [at LCDC] multiple times and he would always do things to get attention and caused disciplinary issues with roommates, things of that nature. Would do gestures just to get officers' attention." Jones Depo. at 7. *See also* Mental Health Follow-Up Contact Sheet, dated June 21, 2007 (ECF No. 76-1 at 48) ("Risk [of suicide] is present due to possibility of accidentally killing self via attention seeking behaviors."). Additionally, no one had attempted to commit suicide by hanging in this shower. Jones Depo. at 18.

As noted in *Farmer*, "that a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so." *Farmer*, 511 U.S. at 844. However, this court is not the factfinder in this matter, and factual determinations in the course of considering a Rule 56 summary judgment motion are to be drawn in the light most favorable to Plaintiff. *See Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) ("'[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.'") (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)); *Odom*, *supra*, 349 F.3d at 770 n.2 (noting that taking evidence in light most favorable to prison guard defendants was "contrary to the legal standard we are to apply on summary judgment.") (Traxler, J.). Therefore, in the light most favorable to Plaintiff, a jury could draw the inference that Defendants Anderson and McElveen were deliberately indifferent to the serious medical needs of Cornett when they gave him a towel and allowed him to shower where they could not observe his activities from their location in the tower.

## V. QUALIFIED IMMUNITY

Having found that a factfinder could determine that Defendants McElveen and Anderson were deliberately indifferent to Cornett's serious medical needs, the court must determine whether Defendants are entitled to qualified immunity.[24]

The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

Determining whether an official is entitled to qualified immunity generally requires a two-step inquiry. *See generally Pearson v. Callahan*, 555 U.S. 223 (2009).[25] The court must determine

---

[24]Defendants argue that Plaintiff "has failed to demonstrate that the constitutional right that [she] alleges to have been violated was 'clearly established' at the time of the alleged misconduct." Memo. in Supp. of Summ. J. at 17 (ECF No. 54-1). However, in the Fourth Circuit, both the burden of pleading and persuasion rests with Defendants. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) ( "The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official."); *see also Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (same); *Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir. 1985) ("It is a well established principle that qualified immunity . . . is a matter on which the burden of proof is allocated to the defendants."); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir.1981) ("the good faith immunity of individual police officers is an affirmative defense to be proved by the defendant"). In *Henry v. Purnell*, 501 F.3d 374, 378 n.4 (4th Cir. 2007), the Fourth Circuit acknowledged a conflict in Fourth Circuit caselaw regarding which party bears the burden of proving that the constitutional right is clearly established. However, the court determined that "[g]iven the conflict in our caselaw on this point, we must follow the earliest of the conflicting opinions. . . . Regarding the burden of proof on qualified immunity, the earliest case appears to be *Logan* [*v. Shealy*, 660 F.2d 1007 (4th Cir. 1981)]."

[25]In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court held that the test for determining qualified immunity requires that the court make a two-step inquiry "in proper sequence." In *Pearson*, however, the Court found that it is not necessary that the court review these steps in a particular order, as the inquiry process is left to the court's discretion. *Pearson*, 555 U.S. at 236. Thus, this court may first inquire whether the right allegedly violated was clearly established at the time of the alleged offense. *Id.* If the right was not clearly established at the time of the alleged offense, then the court's inquiry need go no further. *Pearson* "does not prevent the lower courts

whether, taken in the light most favorable to the plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *Parrish*, 372 F.3d at 301-02. If the facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and the plaintiff cannot prevail. *Id*. If the facts do establish such a violation, however, the court must determine whether the right violated was clearly established at the time of the alleged offense. *Id*. In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. " *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "If the right was not clearly established in the specific context of the case   that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted   then the law affords immunity from suit." *Parrish*, 372 F.3d at 301-02 (citations and quotations omitted).

"Fourth Circuit precedent is one source for determining whether the law was clearly established at the time of the alleged violation." *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (quoting *Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (en banc)) ("In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose . . . .'").

---

from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id*., 555 U.S. at 242.

The question is whether, if a reasonable officer had examined the precedents of the Supreme Court and the Fourth Circuit, that officer would have known that giving a towel and privacy for a shower to an inmate who was a known suicide risk would constitute deliberate indifference to an inmate's serious medical needs in violation of the Constitution.[26] *See, e.g., Gray-Hopkins v. Prince George's County, Md.*, 309 F.3d 224, 230 (4th Cir. 2002) (court "must inquire whether that right was so clearly established at the time of the violation that a reasonable officer in [defendant's] position could not have believed he was acting legally.").

On the date of Cornett's suicide, it was clearly established that it would be a violation of the Fourteenth Amendment for a prison official with actual and constructive knowledge of a pretrial detainee's prior attempts at suicide to fail to take steps to protect such a detainee from self-destruction. *See, e.g., Gordon*, 971 F.2d at 1097 (noting that it was clearly established as early as 1988 that a jailer had a constitutional duty "to take reasonable measures [including removal of a belt] to protect a prisoner from self-destruction when the jailer knows that the prisoner has suicidal tendencies."); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (holding that "due process calls for the taking of appropriate steps to protect detainees who manifest suicidal intent" in case where detainee who jailers knew had a suicidal history and had attempted suicide earlier in the day hanged herself with a bedsheet).[27] There is no reason to draw a legal distinction between failing to remove

---

[26]The official's subjective motivation (in this case, deliberate indifference) is not relevant to the qualified immunity defense, but is relevant to this asserted constitutional claim. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

[27]Later jail suicide cases in the Fourth Circuit have held that the Eighth Amendment is satisfied by video surveillance of a known suicidal inmate. For example, in *Brown v. Harris*, 240 F.3d 383 (4th Cir. 2001), the court found that a defendant's failure to take "additional precautions was negligent, and not deliberately indifferent, because by placing Brown on constant video surveillance, he simply did not disregard an excessive risk to Brown's health or safety." 240 F.3d

an implement of destruction from a known suicidal inmate and—as in this case—handing him the means.

The case law speaks in terms of the law being sufficiently clear to a reasonable officer. Yet "[g]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2001) (quotations and citation omitted).

For these reasons, therefore, Defendants Anderson and McElveen are denied summary judgment on grounds of qualified immunity.

## IV. CONCLUSION

Defendant Major James Harris is dismissed from this action without prejudice pursuant to Federal Rule of Civil Procedure 4(m). Defendants Lt. Kevin Jones and Sgt. Sheralet Taylor are granted summary judgment and are dismissed from this action with prejudice. Defendants John Doe Lexington Correctional Officers 1-5 are dismissed from this action without prejudice. Plaintiff's claim of failure to train is dismissed without prejudice. Plaintiff's claims against Defendants Anderson and McElveen in their official capacity are dismissed without prejudice. Plaintiff's state law claims for wrongful death and survival are dismissed without prejudice. The motion for

---

at 390 (emphasis and quotation omitted). In *Short v. Smoot*, 436 F.3d 422 (4th Cir. 2006), the court found that the constitutional right in question, "defined at the appropriate level of specificity, is the right of a detainee, whose jailers know that he is suicidal, to have his jailers take precautions against his suicide beyond merely placing him in a cell under video surveillance. We hold that *Brown v. Harris*, . . . demonstrates that no such right derives from the Eighth Amendment." 436 F.3d at 427. Video surveillance was not used in the instant case.

summary judgment by Defendants Anderson and McElveen in their individual capacities on Plaintiff's claim pursuant to 42 U.S.C. § 1983 is denied. This matter shall proceed to trial during the term of court beginning June 29, 2012.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON McGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
May 15, 2012